# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

Nº 06 Civ. 5693 (RJS)

————————————

GEM ADVISORS, INC.,

Plaintiff,

VERSUS

CORPORACIÓN SIDENOR, S.A. and
INDUSTRIAS FERRICAS DEL NORTE, S.A.,

Defendants.

————————————

OPINION AND ORDER
October 27, 2009

————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff GEM Advisors, Inc. ("GEMA" or "Plaintiff") brings this action against Defendants Corporación Sidenor, S.A. ("Sidenor") and Industrias Ferricas Del Norte, S.A. ("IFN") (collectively, "Defendants") for breach of contract, indemnification, quantum meruit, unjust enrichment, fraudulent misrepresentation, and fraudulent concealment. Plaintiff contends that Defendants breached a series of letter agreements by selling certain steel mills in Mexico and not paying the required fees for GEMA's services. Plaintiff alleges that Defendants owe a percentage of the sale's value, as defined in the agreements. Further, Plaintiff asserts that Defendants misrepresented the mills' ownership structure, thereby defrauding Plaintiff. GEMA seeks compensatory and punitive damages, as well as attorneys' fees under an indemnification clause contained in each letter agreement.

Before the Court are motions to dismiss filed separately by IFN and Sidenor. IFN moves to dismiss the complaint: (1) pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction, (2) under the doctrine of forum non conveniens, (3) pursuant to Rule 12(b)(6) for failure to

state a claim, and (4) for failure to plead fraud with particularity as required by Rule 9(b).[1] Sidenor seeks to dismiss the claims on the grounds of forum non conveniens, or, in the alternative, pursuant to Rule 12(b)(6).  For the reasons set forth below, Defendants' motions are granted in part and denied in part.

## I.  BACKGROUND

### A.  Facts[2]

#### 1.  Parties

Plaintiff GEM Advisors is a New York corporation headquarted in New York. (Second Amended Complaint ("SAC") ¶ 1.) Defendants IFN and Sidenor are both Spanish corporations.  (*Id.* ¶¶ 2-3.)  The SAC alleges that Sidenor is an affiliate and subsidiary of IFN.  (*Id.* ¶ 2.)  From 1996 through December 12, 2002, IFN was the parent and sole shareholder of Sidenor.  (Decl. of Gonzalo Mugica ("Mugica Decl.") ¶ 4.)  Beginning in December of 2002, however, IFN began

---

[1] Originally, Defendant IFN also moved to strike the Second Amended Complaint pursuant to Rule 60(b)(3), alleging that the SAC's facts conflict with prior sworn statements in the First Amended Complaint ("FAC"). At oral argument, counsel for IFN represented that IFN was no longer pursuing the 60(b)(3) motion.  (Oral Arg. Tr. at 19:9-13, May 19, 2009.)  Accordingly, the Court considers that motion withdrawn.

[2] Unless otherwise indicated, the following facts are taken from the Second Amended Complaint.  For the purpose of resolving the motion, Plaintiff's allegations are assumed to be true and all reasonable inferences are drawn in Plaintiff's favor.  *See Cleveland v. Caplaw Ents.*, 448 F.3d 518, 521 (2d Cir. 2006).  On a motion to dismiss for lack of personal jurisdiction, the Court may consider affidavits submitted by the parties. *See, e.g., Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).

selling its shares of Sidenor, and as of January 16, 2006, it no longer maintains any ownership interest in Sidenor.  (*Id.*)

#### 2.  The Sidenor Agreements

This dispute arises out of the sale of Mexican steel mills owned by Defendants. That sale, GEMA contends, was covered by letter agreements between itself and Defendants that entitle GEMA to payment. Specifically, from 2001 through 2003, GEMA and Sidenor signed a series of engagement letters, under which GEMA was to provide various consulting services focused on finding companies with which Sidenor could engage in certain large transactions.  (SAC Exs. A-E.) These agreements provided that, in return for its services, GEMA would receive certain payments from Sidenor, chiefly a $25,000 "Due Diligence Fee" due upon signing and a Transaction Success Fee ("Success Fee") if Sidenor engaged in any transactions with "Targets" found by GEMA.  (SAC ¶¶ 7, 13, 28, 44, 58, 79.)  As will be discussed *infra*, Plaintiff claims IFN is also a party to these contracts.

The first such agreement was dated November 29, 2001.  (SAC Ex. A (Nov. 29, 2001 Letter Agreement).)  Under that agreement, GEMA was to "serve as financial advisor and investment banker" to Sidenor, assisting in "completing acquisitions, entering into an alliance and/or merger with strategic or financial partner(s), as well as raising new capital in connection with such transactions." (*Id.* ¶ 11, Ex. A)  For its work, GEMA was to receive, among other consideration, a $25,000 Due Diligence Fee and a Success Fee of two-percent of the "Transaction Value" of any "Transaction" with a "Target Investor." Target Investors could be identified by GEMA or Sidenor, and the agreement defines a Transaction broadly to cover acquisitions by

Sidenor or by a Target Investor.  (*Id.* Ex. A.) The agreement was to continue until terminated.  (*Id.*)

GEMA and Sidenor signed a second letter agreement dated January 25, 2002.  (*Id.* ¶ 23; *id.* Ex. B (Jan. 25, 2002 Letter Agreement).) Although that agreement "substitute[d] all of the provisions of the letter dated November 29, 2001" (*id.* Ex. B), it largely parallels the earlier letter, including the scope and fee structure.  (*See id.*)  Like the prior agreement, the January 25, 2002 Letter Agreement was to "continue until terminated."  (*Id.* § 6.)

The third agreement is dated July 4, 2002. (SAC ¶ 38; *id.* Ex. C (July 4, 2002 Letter Agreement).)  Again, it "substitute[d] all of the provisions" of the previous letter, though its terms are similar.  (*Id.* Ex. C.)  Apart from slight adjustments, this letter made one material change.  For the first time, the definition of a Target "include[d] but [was] not limited to" specific companies and opportunities.  As before, GEMA still was to receive a Due Diligence Fee and two percent of the Transaction Value of any Transaction with a Target.  (*Id.*)  The July 4, 2002 letter also provided that the agreement would "continue until terminated."  (*Id.*)

Three months later, the parties executed a fourth letter agreement.  (*Id.* ¶ 53; *id.* Ex. D (Oct. 4, 2002 Letter Agreement).)  Like its predecessors, the October 4, 2002 letter purported to "substitute[] all of the provisions" of the July 4, 2002 agreement. (*Id.* Ex. D.)  Unlike its predecessors, however, the October 4 agreement made two significant changes.  First, it added additional details to the scope of the agreement.  It identified several target companies, including Grupo

Simec ("Simec") and Industrias Campos Hermanos ("ICH"), but the definition of a Target was not limited to the companies listed.  (*Id.*)  Moreover, "Transaction" was defined to cover, inter alia, transactions involving "all or a material portion of businesses in Mexico in which [Sidenor] or any of its affiliates or subsidiaries holds a controlling stake."  (*Id.*)  Second, the fee structure was altered.  While GEMA was still entitled to a $25,000 Due Diligence Fee upon signing, the method for determining compensation "in the event [Sidenor] enter[ed] into a Transaction with a Target" was different.  (*Id.*)  Specifically, the October letter agreement stated that the "amount of such Transaction Success Fees shall be mutually agreed between [Sidenor] and GEMA at a later time."  (*Id.*)  In contrast to the exact two-percent figure agreed to in prior letters, the Success Fee under the October 4 agreement was to "be in an average range of 2.0% (two-percent) of each Transaction Value, and will be determined prior to October 31, 2002."  (*Id.*)

In connection with the services that GEMA was to provide under the agreements, around September or October 2002, Sabino Arrieta and Enrique Teruel, at least one of whom is alleged to "own[] and control[]" both IFN and Sidenor, approached GEMA for assistance in selling the Mexican steel mills. (SAC ¶¶ 89, 103.)  The following month, GEMA introduced ICH and Simec to Defendants as potential buyers.  (*Id.* ¶ 91.) GEMA then set up a conference call with ICH and Defendants in January 2003.  During that call, ICH offered to purchase the Mexican steel mills.  (*Id.* ¶ 97.)  Shortly thereafter, however, Defendants rejected the purchase offer.  (*Id.* ¶ 98.)  As a result of Defendants'

rejection of the purchase offer, Plaintiff concluded that negotiations between Defendants and ICH for the sale of the mills had terminated. (*Id.*)

The last letter agreement identified in the SAC is dated February 21, 2003. GEMA alleges that it signed that agreement and sent a copy to Sidenor. (*Id.* ¶¶ 70-71; *id.* Ex. E (Feb. 21, 2003 Letter Agreement).) This agreement, like the others, covered various financial services, specifically naming several possible transactions in Mexico and South America. (*Id.* Ex. E.) The letter also "substitute[d] all of the provisions" of the October 4, 2002 agreement "when executed by both parties." (*Id.*) It was to continue in effect until terminated. For its services, GEMA was to receive a $25,000 Due Diligence Fee and two-percent of the value of an investment into "Sidemex and/or Sidenor ABX." (*Id.*) In the event that any other transactions materialized, fees would be mutually agreed upon before March 30, 2003. (*Id.*) GEMA asserts that Sidenor accepted this letter but did not send a signed copy back.[3] (*Id.* ¶¶ 72-73.)

---

[3]  The facts and precise allegations surrounding the February 21, 2003 letter are unclear. For example, contrary to the allegations in the SAC, the First Amended Complaint ("FAC") states that the letter sent by Plaintiffs was never accepted by Defendants. (FAC ¶ 53.) Moreover, Defendants have produced an alternative version of a February 21, 2003 letter, allegedly signed by both parties. (Decl. of Stephen M. Harnik in Support of Sidenor's Motion to Dismiss Ex. E (Harnik Decl.).) Plaintiff maintains that Defendants' version is a forgery. (*See, e.g.*, Oral Arg. Tr. at 36:3-6, June 4, 2008.) For the purposes of this section, the Court accepts Plaintiffs' allegations in the SAC. As such, those are the facts recounted above.

### 3.  IFN's Relationship with Sidenor

Each of the above-described agreements is signed by or addressed to only Sidenor, not IFN. (*Id.* Exs. A-E.) Nonetheless, with respect to the sale of the Mexican steel mills, Plaintiff alleges that IFN agreed to and intended to be bound "by the applicable engagement letter." (*Id.* ¶ 102.) Specifically, GEMA alleges that when Defendants initially approached them about selling the mills, Defendants claimed that the mills were owned by Sidenor and other third parties, but not IFN. (*Id.* ¶ 89.) Around March or April 2003, however, GEMA alleges that it discovered documents which revealed that IFN also had a direct ownership interest in the mills. (*Id.* ¶ 100.) Plaintiff confronted Defendants who confirmed that IFN did, in fact, directly own a portion of the steel mills. (*Id.* ¶ 101.) As a result of this discovery, GEMA inquired into IFN's obligations under the letter agreements. (*Id.* ¶ 102.) IFN allegedly assured GEMA that it intended and understood itself to be bound under the relevant agreements, despite not being named in the agreements themselves, and that it was therefore unncessary to amend or alter the existing agreements to include IFN explicitly. (*Id.*)

### 4.  The Mexican Steel Mills Transaction

Contrary to GEMA's belief that discussions between Defendants and ICH had terminated in early 2004. Defendants and ICH announced an agreement on May 19, 2004, in which ICH would purchase Defendants' interest in the Mexican steel mills. (*Id.* ¶ 106.) The transaction closed on August 9, 2004. (*Id.* ¶ 107.) Plaintiff alleges that the deal was worth at least $150 million,

and that it is therefore owed a Success Fee of $3 million.  (*Id.* ¶¶ 111-112.)

## B.  Procedural History

Plaintiff filed the initial Complaint on July 27, 2006.  On January 12, 2007, Plaintiff filed the First Amended Complaint ("FAC"). Defendants Sidenor and IFN filed separate motions to dismiss on February 26, 2007.  On March 28, 2007, Plaintiff filed two opposition memoranda responding independently to Defendants' motions.  IFN replied on April 24, 2007, and Sidenor did so on April 25, 2007.

The case was reassigned to the undersigned from the Honorable Kenneth M. Karas, District Judge, on September 4, 2007. The Court then heard oral argument on the motions to dismiss on June 4, 2008.  The Court issued an Order on July 2, 2008 permitting Plaintiff to file the SAC, pursuant to Rule 15(a), and setting out a briefing schedule.

Plaintiff submitted the SAC on July 21, 2008.  In response to the SAC, Defendants each filed a motion to dismiss on August 11, 2008.  Plaintiff responded on August 29, 2008 and Sidenor submitted a reply motion on September 10, 2008.  The Court held oral argument on the motion to dismiss the SAC on May 19, 2009.

## II.  DISCUSSION

Defendants argue numerous grounds exist for dismissing each of the counts in the SAC. IFN seeks to dismiss the claims (1) pursuant to Rule 12(b)(2) for lack of personal jurisdiction, (2) under the doctrine of *forum*

*non conveniens*, (3) pursuant to Rule 12(b)(6) for failure to state a claim, and (4) for failure to plead fraud with particularity as required by Rule 9(b).  Sidenor seeks to dismiss the claims on the grounds of forum non conveniens, or, in the alternative, pursuant to Rule 12(b)(6).

For the reasons set forth below, the Court (1) denies Defendants' motion to dismiss for lack of personal jurisdiction and on the grounds of forum non conveniens, (2) grants Defendants' motions to dismiss the claims for breach of the October 4, 2002 agreement, and (3) grants Defendants' motions to dismiss the indemnification claims in their entirety. Defendants' motions to dismiss are denied as to the remaining claims.

## A.  Personal Jurisdiction

"On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).  Prior to discovery, a plaintiff can defeat a motion for lack of jurisdiction by making a prima facie showing, through affidavits and supporting materials, that jurisdiction exists.  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *see also Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).

A federal district court sitting in diversity may exercise personal jurisdiction to the same extent as a state court of general jurisdiction in the state in which the court sits.  Fed. R. Civ. P 4(k)(1)(A); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,

305 F.3d 120, 124 (2d Cir. 2002). As an initial matter, a district court must determine if New York law would confer jurisdiction upon its own courts. *Bank Brussels*, 305 F.3d at 124. In this case, that requires applying New York's long-arm statute, N.Y. C.P.L.R. § 302. Second, the court must ensure that the exercise of jurisdiction would not offend the Due Process Clause of the Fifth Amendment. *Bank Brussels*, 305 F.3d at 127.

The SAC alleges jurisdiction under all three subsections of New York's long-arm statute. N.Y. C.P.L.R. § 302(a). Plaintiff argues that jurisdiction is proper because IFN or its agent (1) transacted business in New York, (2) committed a tortious act within New York, and (3) committed a tortious act outside of New York while reasonably suspecting effects in New York and deriving substantial revenue from interstate commerce. For the reasons that follow, the Court is satisfied that Plaintiff has met its prima facie burden of showing personal jurisdiction over IFN.

### 1. Derivative Theories of Personal Jurisdiction

As a preliminary matter, Plaintiff asserts that IFN is amenable to jurisdiction because of its relationship with Sidenor. (SAC ¶ 105; Pl.'s Mem. in Opp. to IFN's Motion to Dismiss 9-15, Mar. 28, 2007 (Pl.'s Mar. 28, 2007 IFN Mem.).) *See also* N.Y. C.P.L.R § 302(a). While Plaintiff relies specifically on an agency relationship in the SAC to establish jurisdiction, jurisdiction will also be found where the company has a subsidiary that is amenable to jurisdiction and is found to be a "mere department" of the corporate parent. *See Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 Civ. 13157 (GEL), 2006 WL

3735657, at *13 (S.D.N.Y. Dec. 15, 2006). The Court will analyze the relationship with Sidenor under both theories.

#### a. Sidenor as IFN's Agent

To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent "acts 'for the benefit of, and with the knowledge and consent of, the non-resident principal,' and over which that principal exercises 'some control'." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)) (internal citations omitted). In determining if an agency relationship exists for purposes of personal jurisdiction, a court should analyze "the realities of the relationship in question rather than the formalities of agency law." *Id.* (citing *CutCo*, 806 F.2d at 366); *see also Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).

In this case, GEMA adequately alleges facts to establish benefit, consent, and control. For example, GEMA alleges that IFN stood to benefit from Sidenor's actions and contracts by receiving some or all of the sale price. (SAC ¶ 108.) Further, whether or not the contract explicitly conferred formal rights upon IFN, the SAC alleges that IFN benefitted broadly from the transaction through its relationship with Sidenor. (Pl.'s Mar. 28, 2007 IFN Mem. 10-11.) In addition, GEMA makes numerous assertions of control, knowledge, and consent with respect to both entering into the letter agreements and with respect to the fraudulent acts. (*See* Decl. of Julio Marquez in Opp. to IFN's Motion to

Dismiss ("Marquez Decl.") at 2 ("Sabino Arrieta and Enrique Teruel further represented to GEM that both Sidenor and IFN are owned and controlled by Sabino Arrieta, that there was no separate decision-making between the two entities, [and] that the same officers exercised control over both entities.").)  In short, the SAC and supporting affidavits state a prima facie claim that Sidenor acted as IFN's agent for purposes of jurisdiction.

   b.  Sidenor as a "Mere Department" of IFN

      In addition to making a prima facie showing of an agency relationship, Plaintiff's SAC and supporting affidavit are sufficient to allege that Sidenor was a "mere department" of IFN for purposes of asserting personal jurisdiction.  "Establishing the exercise of personal jurisdiction over an alleged alter ego requires application of a less stringent standard than that necessary to pierce the corporate veil for purposes of liability." *Storm LLC*, 2006 WL 3735657 at *13 n.8 (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).  In fact, when veil piercing is only being used to assert jurisdiction, "the question is only whether the allegedly controlled entity 'was a shell' for the allegedly controlling party; it is not necessary to show also 'that the shell was used to commit a fraud,'" which is normally required to pierce the corporate veil for liability.  *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 458 (S.D.N.Y. 2007) (quoting *Marine Midland*, 664 F.2d at 904)).

      The Second Circuit has set forth four factors that courts should consider when determining if a subsidiary is a mere department or shell of a parent for jurisdictional purposes.  *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984) (applying New York law).  These factors are (1) whether there exists common ownership and the presence of an interlocking directorate and executive staff, (2) the degree of financial dependency of the subsidiary on the parent, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of the parent's control of the subsidiary's marketing and operational policies.  *Id.*

      The allegations contained in the SAC and supporting affidavits are sufficient to satisfy these requirements.  GEMA President Julio Marquez's affidavit states that Sabino Arrieta and Enrique Teruel represented to GEMA that "both Sidenor and IFN are owned and controlled by Sabino Arrieta, there was no separate decision-making between the two entities, the same officers exercised control over both entities; and [that] GEM should treat Sidenor and IFN as the same entity for purposes fo the Transaction with Target ICH."   (Marquez Decl.)   Arietta's representations support a conclusion that there is complete common ownership and control between the companies and that there is no separate operation between them.  While the SAC and supporting affidavit are silent regarding corporate formalities, they nonetheless make a prima facie showing that Sidenor was a mere department of IFN.

c.  Sidenor Transacted Business in
New York

After establishing the requisite relationship between Sidenor and IFN, Plaintiff alleges that Sidenor transacted business in New York in satisfaction of section 302(a)(1) of the long-arm statute. In deciding whether a party has transacted business in New York under section 302(a)(1), a court may consider a number of relevant factors, none of which is dispositive. Such factors include:

(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (internal citations omitted). In addition, section 302 is "a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York." *Nat'l Union Fire Ins. Co.*, 319 F. Supp. 2d at 359 (citing *Kreutter*, 71 N.Y.2d at 467).

Based on the pleadings before the Court, Sidenor has transacted business in New York. First, Sidenor had a contractual relationship with GEMA, a New York corporation. (SAC ¶¶ 1, 7.) According to the SAC, negotiations for each letter agreement were conducted in New York. (*Id.* ¶¶ 9, 24, 39, 75.) In addition, the SAC alleges that "[u]nder each of the agreement letters, Defendants were required to" and did send "payments to GEM in New York," "Defendants communicated with GEM in New York via phone, mail, and/or electronic means," and "Defendants made numerous trips to visit GEM in New York regarding their business relaionship." (*Id.* ¶¶ 85-88.) The letter agreements at issue each contain a New York choice-of-law provision. (*Id.* Exs. A-D § 7, Ex. E § 6.) Such allegations establish a prima facie showing that Sidenor transacted business in New York under section 302(a)(1).

2.  IFN and Sidenor Committed Tortious Acts
Within and Outside of New York

As an alternative basis of personal jurisdiction, Plaintiff contends that IFN directly, and through its agent Sidenor, committed tortious acts inside and outside of New York, subjecting it to jurisdiction under § 302(a)(2) and (a)(3)(ii) of the long-arm statute. (SAC ¶ 99.) Plaintiff has adequately supported these bases of jurisdiction through its SAC and supporting affidavits.

The affidavit of Julio Marquez factually supports the conclusion that IFN and Sidenor committed tortious acts within New York. Marquez recounts that the allegedly fraudulent statements were made by Arietta and Teruel and that Arietta claimed that he "owned and controlled" both Sidenor and

IFN.  In the SAC, Plaintiff also alleges that these representations were made in November 2001, September through October 2002, and January through February 2003.  (SAC ¶ 242; Marquez Decl.)   Further, the specific allegations of ownership, which are the basis for the fraud claim, were made by "oral and written representations in New York and oral and written communications at meetings in Mexico and in New York in January-February 2003."  (SAC ¶ 99.)  Crediting these claims, the Court concludes that Plaintiff has made a prima facie showing that IFN and Sidenor committed tortious acts within New York.

As for section 302(a)(3), relating to tortious acts committed outside of New York, a court may exercise personal jurisdiction over a defendant who "commits a tortious act without the state causing injury to person or property within the state," as long as the actor "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."   N.Y.  C.P.L.R. § 302(a)(3).

GEMA alleges sufficient facts with regard to the fraud to support the exercise of § 302(a)(3) jurisdiction in this case.  The SAC alleges that IFN, by its own officers and through its agent Sidenor, fraudulently misrepresented the ownership structure of the Mexican steel mills so that GEMA would enter into and continue to perform under the various letter agreements.  (See SAC ¶¶ 241-252.)  These accusations are supported by the affidavit of Julio Marquez.  (Marquez Decl.)

Assuming that IFN and Sidenor, as IFN's agent, did fraudulently conceal and misrepresent information to Plaintiff, IFN expected or should have reasonably expected consequences in New York, including the financial harm to the victim of the fraud, Plaintiff, which is located in New York. Further, the SAC is replete with facts that support an inference that IFN derives a substantial portion of revenue from international commerce, including the $150 million transaction with the Mexican steel mills that took place in August 2004.  (SAC ¶ 107.)

### 3. The Exercise of Personal Jurisdiction Comports with Due Process

Although an exercise of personal jurisdiction must comport with due process, where personal jurisdiction is appropriate under section 302(a), the requirements of due process are met.  *See D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *Cartier v. Oakley*, No. 06 Civ. 5841 (LAP), 2006 WL 3635321, at *4 (S.D.N.Y. Dec. 11, 2006).

\* \* \*

In sum, GEMA has made an adequate prima facie showing that IFN is amenable to personal jurisdiction because of its relationship with Sidenor, which both transacted business in New York and committed tortious conduct within the state. Personal jurisdiction is also appropriate because of the alleged tortious acts committed by IFN within and without New York.

### B.  Forum Non Conveniens

Alternatively, Defendants argue that Plaintiff's claims should be dismissed under

the doctrine of forum non conveniens.  The Court is not persuaded.

Forum non conveniens is a discretionary device permitting a court, in rare instances, to dismiss an action "'even if the court is a permissible venue with proper jurisdiction over the claim.'"  *Carey v. Bayerische Hypo-und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000)).  The analysis "starts with 'a strong presumption in favor of the plaintiff's choice of forum.'"  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).  To decide whether Defendants have met their burden in demonstrating that a case should be dismissed, the Second Circuit applies a three-step test:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum.  At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute.  Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum*, 416 F.3d at 153 (citing *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001)).

Assuming *arguendo* that Spain is an adequate alternative forum — step two of the analysis — Defendants' arguments nevertheless fail under steps one and three. At step one, the Court finds that Plaintiff's choice of forum should receive significant weight.  A court "should begin with the assumption that a plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference."  *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002).  Moreover, "plaintiff's choice of forum is generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." *Iragorri*, 274 F.3d at 71.  Here, Plaintiff is a New York corporation based in New York City and has sued in New York.  (*See, e.g.*, SAC ¶¶ 1, 9, 24, 39, 54, 86.)  Defendants make no real attempt to argue that this choice should receive little deference under step one, and the Court does not find any persuasive reason why it should.

Defendants' arguments instead focus on step three in an effort to show that, on balance, Spain is a preferable forum. Defendants point, for example, to documents and witnesses in Spain.  (Def. Sidenor's Mem. in Support of its Motion to Dismiss the FAC 16, Feb. 26, 2007 (Sidenor's Feb. 26, 2007 Mem.).)  Further, they argue that the contracts were not signed in New York and that few relevant events took place here.  (*See id.* at 14-19.)

Notwithstanding these arguments, the Court finds sufficient justification for the litigation to remain in the Southern District of New York.  These reasons arguably weigh in favor of New York and, at worst, offset the reasons offered in favor of Spain.  The contracts at issue, for instance, are in English, not Spanish.  (SAC Exs. A-E.)  Each contract is also governed by New York law.  (*Id.* ¶¶ 22, 37, 52, 69, 84.)  GEMA witnesses are located in New York.  Further, Plaintiff has

alleged numerous contacts by Defendants with New York. (*Id.* ¶¶ 85-87.) In conjunction with the step one analysis, the Court finds that the balance of factors counsels against dismissing this case.

Accordingly, Defendants' motions to dismiss the action on the basis forum non conveniens are denied.

## C.  Rule 12(b)(6) Arguments

### 1.  Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-pleaded allegations contained in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *id.* at 570, but the "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true," *id.* at 555 (citation omitted). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In contrast, "[a] pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### 2.  Analysis

Defendants move to dismiss each count in the SAC pursuant to Rule 12(b)(6). For the following reasons, Defendants' motions to dismiss the indemnification claims and the claims relating to breach of the October 4, 2002 agreement are granted, while the motions as to the remaining claims are denied.

#### a.  IFN's Liability

As a preliminary matter, the Court will address whether and how Plaintiff sufficiently alleges that IFN is a proper defendant in this action. Plaintiff asserts breach of contract and quasi-contract claims against both Sidenor and IFN, even though each of the negotiations alleged in the SAC was only "conducted . . . with Sidenor." (SAC ¶¶ 9, 24, 39, 54.) In order to justify inclusion of IFN as a defendant, Plaintiff advances several theories of liability: (1) IFN adopted, or bound itself to, the letter agreements orally; (2) IFN orally agreed to act as a surety for Sidenor's obligations under the letter agreements; (3) Sidenor was acting as IFN's agent, as well as on its own behalf, in negotiating and signing each letter agreement; and (4) IFN is liable under the letter agreements by piercing Sidenor's corporate

veil.[4]   Although the first three of these arguments fail under the New York Statute of Frauds[5] and principles of agency law, Plaintiff's allegations with respect to the veil piercing theory are sufficient to assert claims against IFN at this early stage of the litigation.

"Under New York law, a court may pierce the corporate veil where 1) 'the owner exercised complete domination over the corporation with respect to the transaction at issue,' and 2) 'such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *MAG Portfolio*

Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).

The first inquiry, domination and control, requires the district court to evaluate a number of factors touching on corporate formalities, capitalization, ownership, and control, among other factors.[6]  With respect to control over certain transactions, New York courts have required "not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985) (quoting *Lowendahl v.*

---

[4]  Plaintiff's Memorandum in Opposition to IFN's Motion to Dismiss the FAC argues that IFN is liable because "a parent corporation will be deemed a party to its subsidiary corporation's contract if the parent manifests an intent to be bound thereby." (Pl.'s Mar. 28, 2007 IFN Mem. 15.)  Some of the cases cited for this proposition, however, are cases dealing with piercing the corporate veil, and not, as Plaintiff believes, principal-agent relationships.  *See Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 316 (S.D.N.Y. 2003); *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (App. Div. 1997).

[5]  The tasks enumerated in each letter agreement all clearly fall within this provision.  For example, the July 4, 2002 agreement, representative of all of the agreements, requires GEMA to conduct due diligence and financial analysis related to any transactions identified, seek out and interact with potential sources of financing, and develop a general negotiating strategy for accomplishing any proposed transactions.  (SAC Ex. C § 1.)  Such activities have all been found to fall within the broad umbrella of § 5-701(a)(10), which embraces the "'the use of connections, ability, and 'knowledge' to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information.'" *Zeising v. Kelly*, 152 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) (citing *Orderline Wholesale Distrib., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 128 (S.D.N.Y. 1987)).

[6]  The full compliment of factors that the Second Circuit has indicated a Court may consider include

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio*, 268 F.3d at 63 (citing *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

*Baltimore & Ohio R.R.*, 287 N.Y.S. 62, 76 (App. Div. 1936), *aff'd*, 272 N.Y. 360 (1936)).

The second component, fraud or wrong causing injury, can be satisfied by showing a "breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights." *Elec. Switching Indus. v. Faradyne Elec. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987). While "[v]eil-piercing is a fact specific inquiry and courts consider many factors," *Network Enters., Inc. v. APBA Offshore Prod., Inc.*, 427 F. Supp. 2d 463, 488 (S.D.N.Y. 2006), conclusory allegations of an alter ego are insufficient to survive a motion to dismiss. *See Manos v. Geissler*, 377 F. Supp. 2d 422, 425 (S.D.N.Y. 2005).

Review of the SAC reveals that Plaintiff's allegations of dominance and control are brief but sufficient to meet the requirements of Rule 12(b)(6). Plaintiff's primary allegations are that:

103. In or about March-April 2003, Sabino Arrieta and Enrique Teruel further represented to GEM that both Sidenor and IFN are owned and controlled by Sabino Arrieta, that there was no separate decision-making between the two entities, that the same officers exercised control over both entities, and that GEM should treat Sidenor and IFN as the same entity for purposes of the transaction with Target ICH.

104. Upon information and belief, the officers and/or employees of IFN exercised control over the daily operations of Sidenor.

(SAC ¶ 103-104.)

These alleged admissions made by Arrieta and Teruel demonstrate complete overlap of ownership and control, that no independent discretion was exercised by the subsidiary, and that the dealings between the corporations were not at arms-length. Although none of these factors is dispositive, the alleged admission of Arrieta and Teruel that IFN and Sidenor are essentially the same company is sufficient evidence of domination and control for this pre-discovery motion.

Of course, a showing of domination and control is not enough, on its own, to support piercing the corporate veil. "The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Morris v. N.Y. State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141 (1993) (citing *Matter of Guptill Holding Corp. v. State*, 307 N.Y.S.2d 970 (App. Div. 1970), *aff'd*, 31 N.Y.2d 897 (1972)).

In this case, the allegations of fraud, as developed more fully *infra*, are sufficient to show a wrong or injustice at the pleading stage. These acts included repeatedly representing that IFN had no direct ownership in the Mexican steel mills (SAC ¶ 242), thus causing GEMA to enter into and perform under the letter agreements without requiring IFN to bind itself to a separate agreement. (SAC ¶ 245.)

Because Plaintiff has pled a valid claim for piercing Sidenor's corporate veil and

binding IFN under the various letter agreements, the Court will analyze the breach of contract claims against both defendants. Moreover, since the theory potentially binds IFN to the written contracts, these contracts can also operate as the bases for Plaintiff to pursue its quasi-contract claims against IFN.

### b. Breach of Contract Claims

Plaintiff asserts causes of action for breach of the Success Fee provisions of the five letter agreements.  Defendants move to dismiss all of Plaintiff's contract claims.

#### i. February 21, 2003 Agreement

Plaintiff's first cause of action is for breach of the Success Fee provision of the February 21, 2003 letter agreement. Defendants contend that Plaintiff has failed to validly plead the existence and breach of the February 21, 2003 agreement.

The parties disagreement as to whether a valid claim was pled turns on whether or not the February 21, 2003 agreement was ever accepted by Sidenor.  Plaintiff alleges, however, that "[u]pon information and belief, Sidnor accepted the February 21, 2003 Engagement letter by signing it." (SAC ¶ 72.) Factual allegations like this, that Sidenor signed the agreement, must be accepted by the Court as true for the purposes of determining a motion to dismiss.  *See Iqbal*, 129 S. Ct. At 1950 ("When there are well-pleaded factual allegations, a court should assume their

veracity."[7]  Accordingly, the Court declines to dismiss the first claim in the SAC.

#### ii. October 4, 2002 Agreement

Alternatively, the SAC also alleges several claims for breach of the Success Fee provision of the October 4, 2002 agreement should the February 21 agreement be found invalid. (SAC ¶¶ 132, 140-56.) Defendants move to dismiss the claims arising from the October 4, 2002 agreement, arguing that the indefiniteness of the compensation provision renders the contract unenforceable. (Sidenor's Feb. 26, 2007 Mem. 6-11.) The Court agrees.

The compensation provision of the October 4, 2002 agreement provides that

> [t]he amount of such Transaction Success Fees shall be mutually agreed between [Sidenor] and GEMA at a later time, when a list of alternative outcomes reflecting [Sidenor's] priorities is prepared by the parties. These amounts will be in an average range of 2.0% (two percent) of each Transaction Value, and will be determined prior to October 31, 2002.

(SAC Ex. D § 2(b).)

---

[7]  If, as Defendants contend, Plaintiff does not have a factual basis for its allegations of acceptance, the appropriate remedy lies in Rule 11, which requires that, when filing a complaint, "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2).

"Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001); *see also Carruthers v. Flaum*, 450 F. Supp. 2d 288, 309 (S.D.N.Y. 2006) ("If the parties have not reached a final agreement on the fundamental terms of the deal, no *contract* has been formed."). The consideration to be paid under a contract is a material term. *See Carruthers*, 450 F. Supp. 2d at 309; *see also Major League Baseball Props., Inc. v. Opening Day Prod., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("Price or compensation are material terms in a contract requiring definiteness.").

The failure to fix a sum certain, however, is not necessarily fatal to a contract. The New York Court of Appeals has held that:

> a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.

*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). New York courts have even enforced, for example, contracts where the parties "agreed compensation would be in accordance with customary rates for the industry in general." *Kenneth D. Laub & Co. v. Bear Stearns Co.*, 692 N.Y.S.2d 30, 31 (App. Div. 1999). Even by this forgiving standard, however, the compensation provision of the October 4, 2002 agreement is insufficiently definite. The provision contains no methodology, formula, or external measure by which the Court might objectively determine the compensation to be paid; indeed, the provision explicitly calls for a "new expression" by the parties to fix the consideration due GEMA under the agreement. This vagueness is fatal to Plaintiff's contract claims relating to the October 4, 2002 agreement. *See, e.g.*, *Georgiadis v. First Boston Corp.*, No. 90 Civ. 7672 (PKL), 1993 WL 22122, at *7 (S.D.N.Y. Jan. 26, 1993) (dismissing contract claim where the contract "failed to set any standards that would determine the form or level of compensation due" and "clearly contemplated a further writing concerning the terms of compensation"); *see also Carmon v. Soleh Boneh Ltd.*, 614 N.Y.S.2d 555, 556 (App. Div. 1994) ("[T]here is nothing in the letter of intent which provides a methodology for determining its open terms."). *Cf.* Restatement (Second) of Contracts § 33 cmt. e ("Where the parties manifest an intention not to be bound unless the amount of money to be paid by one of them is fixed or agreed and it is not fixed or agreed there is no contract."). Accordingly, Plaintiff's claims under the October 4, 2002 agreement are dismissed.

### iii. The July 4, 2002 Contract

The SAC also alleges claims for breach of the July 4, 2002 contract, should the October 4, 2002 contract be found unenforceable as well as the February 21, 2003 agreement. (SAC ¶¶ 157-163, 169-185.) Defendants contend that the July 4, 2002 agreement was terminated by the subsequent agreement between the parties. (Def. Sidenor's Supp. Mem. in Support of its Motion to Dismiss 7, Aug. 11, 2008 (Sidenor's Aug. 11, 2008 Mem.).) Since the fee provision of the October 4, 2002 contract is unenforceable, however, the Court must determine the effect of the October termination provision on the July 4 agreement.

The prefatory paragraph of the October agreement states that "[o]nce executed, this letter will substitute all of the provisions of the letter dated July 4, 2002, signed between GEMA and the Company." (SAC Ex. D.) Sidenor asserts that the portion of the October agreement concerning the termination provision is severable and enforceable, effectively terminating the earlier letter agreement. (Sidenor's Aug. 11, 2008 Mem. 8.) Plaintiff asserts that if the fee provision of the October 4, 2002 letter is invalid, then the entire contract is void and the July 4, 2002 agreement remained in effect. (Pl.'s Supp. Mem. in Opp. To Def.'s Motions to Dismiss 8-9, Aug. 29, 2008 (Pl.'s Aug. 29, 2008 Mem.).)

Where a provision of a contract is unenforceable because of an indefinite term, the whole contract is unenforceable unless the contract is severable. *See Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1162 (S.D.N.Y. 1998). A contract is generally considered to be entire, as opposed to severable, when, by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another. A contract will only be regarded as severable if "(1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalent." *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992) (citing Restatement (Second) of Contracts § 240)).

"Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." *Christian v. Christian*, 42 N.Y.2d 63, 73 (1977) (citing 5 Williston on Contracts § 767 (3d ed.)). Where the contents of the contract are clear, severability is a matter of law for the court to decide. *Riccardi v. Modern Silver Linen Supply Co.*, 356 N.Y.S.2d 872, 877 (App. Div. 1974). Where the intent of the parties is not clear from the language of the contract itself, however, it is a question of fact to be decided by the jury. *See Cary Oil Co. v. MG Refining & Mktg., Inc.*, 257 F. Supp. 2d 768, 772-73 (S.D.N.Y. 2003).

Sidenor argues that the termination and fee provisions of the October 4, 2002 agreement were severable. (Def. Sidenor's Reply Supp. Mem. in Support of its Motion to Dismiss 3, Sept. 10, 2008 (Sidenor's Sept. 10, 2008 Mem.).) Specifically, Sidenor alleges that "it is clear that the parties intended the October 4, 2002 Engagement Letter to be severable . . . . The termination provision and Sidenor's duty to pay the due diligence fee (which was admittedly performed) are clearly

severable from the unenforceable provision regarding the finder's fee." (*Id.* at 4.)

The contract lends little support to Sidenor's position. In the prefatory section of the October 4, 2002 agreement, the parties agree that, "once executed," the new agreement will "substitute all of the provisions of the letter dated July 4, 2002." (SAC Ex. D.) The agreement then lays out five general duties of GEMA in section one: (a) conducting due diligence with any identified transaction, (b) performing financial analysis and valuations for the benefit of Sidenor with respect to any potential transactions, (c) identifying and interacting with any potential targets, (d) coordinating any due diligence initiated by any target, and (e) developing a general negotiating strategy for closing or negotiating any potential transactions covered by the agreement. (*Id.* § 2.) In return, the October agreement obliged Sidenor to pay (1) a $25,000 "Due Diligence Fee," (2) a Success Fee should certain transactions occur, and (3) reimbursement to GEMA for expenses incurred. (*Id.*)

The Court concludes that the contractual language is unambiguous: the parties intended the contract to be entire and not subject to judicial division. The whole thrust of the agreement was for GEMA to seek out and facilitate transactions on behalf of Sidenor. The contract did not create separate goals, but simply described steps that GEMA would take towards the single goal of finding suitable Tagerts. Further, the contract does not link any of Sidenor's payments with any of GEMA's obligations. Even if, as Sidenor alleges, the $25,000 Due Diligence Fee that Sidenor was required to pay GEMA was for specific due diligence activities, the contract

does not attempt to link any obligations to the substitution clause. In fact, the substitution clause itself makes clear that the October 4, 2002 letter agreement was intended to *entirely* replace the July 4, 2002 agreement, leading to the conclusion that the parties did not intend for a piecemeal replacement of the earlier letter agreement. It is inexplicable that GEMA would have chosen to take on a full slate of obligations without any guarantee of a Success Fee, which ultimately would be the largest portion of its compensation by far. Accordingly, the Court concludes that the contract is not severable, and that the entire October 4, 2004 agreement is unenforceable.

Because the October 4, 2002 agreement is invalid, the July 4, 2002 agreement remained effective after October 4, 2002. "If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract." Restatement (Second) of Contracts § 279 cmt. a (1981); *see also Kindler v. Newsweek, Inc.*, 717 N.Y.S.2d 56, 57 (App. Div. 2000) (holding merger clause extinguished earlier agreement). However, where the substituted contract is invalid, for indefiniteness or otherwise, the original contract remains enforceable. *See Waters v. Smith,* 23 N.Y. Wkly. Dig. 500, 501 (N.Y. Sup. Ct. 1885) (concluding that a valid existing agreement will not be extinguished or deemed abandoned by reason of a subsequent arrangement between the parties that is void by reason of its uncertainty); *cf.* Restatement (Second) of Contracts § 279 cmt b. ("[T]o the extent that the substituted contract is vulnerable on such grounds as mistake, misrepresentation, duress or unconscionability, recourse may be had on the original duty. . . . If the substituted contract is

unenforceable because of the Statute of Frauds, it does not bar enforcement of the original duty.").

Because the Court has concluded that the July 4, 2002 letter agreement was not terminated by the parties' execution of an otherwise void October agreement, Defendants' motions to dismiss Plaintiff's causes of action relating to the July 2002 Agreement are denied.[8]

### c. Indemnification

In addition to its claims for breach of contract, Plaintiff also brings separate claims styled "indemnification" pursuant to each of the letter agreements executed by Plaintiff and Sidenor. (*See, e.g.*, SAC ¶¶ 164-168.) Defendants move to dismiss these claims.

It is well settled that "the intent to provide for counsel fees as damages for breach of contract must be 'unmistakably clear' in the language of the contract." *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20-21 (2d Cir. 1996) (citing *Hooper Assocs. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989)). Thus, where a general indemnification provision does not explicitly provide for indemnification for suits *between* the parties to the contract, a claim for such indemnification must fail. *See, e.g., Sequa*

---

[8]   In addition to the contractual claims already discussed, Plaintiff pleads, in the alternative, breach of contract claims for the letter agreements dated January 25, 2002 and November 29, 2001. (SAC ¶¶ 193-213, 219-227.) Because the remaining Success Fee claims are pled in the alternative, and no party further challenges the July 4, 2002 letter as valid, the Court will not address those claims at this time.

*Corp. v. Gelmin*, 851 F. Supp. 106, 110-11 (S.D.N.Y. 1994) ("If the claims covered refer exclusively or unequivocally to claims between the parties, a Court may interpret an indemnification agreement to include such claims. If not, then a court must find the agreement to be lacking evidence of the required intent.").

The indemnification provisions at issue here provide, in pertinent part, that

> [t]he Company agrees to indemnify GEMA and its respective directors, officers, employees, agents and controlling persons . . . from and against any and all losses, claims, damages, expenses and liabilities . . . to which such Indemnified Party may become subject . . . related to or otherwise arising out of any Transaction contemplated by this letter agreement . . . and will reimburse any Indemnified Party for all expenses (including reasonable counsel fees and expenses) incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom.

(SAC Exs. A, B, C, E § 5.) These provisions do not unequivocally or unmistakably cover disputes between the parties. Indeed, the Second Circuit has held that a similar provision providing that "[t]he Agency shall indemnify and save [plaintiff] harmless from any and all claims, demands or cause of action, any and all costs or expenses, including attorneys fees" did not constitute "an unmistakably clear statement" sufficient

to support an award of attorney's fees in a suit between the two parties to the agreement. *Bridgestone/Firestone*, 98 F.3d at 21. Accordingly, Plaintiff's indemnification claims are dismissed.

### d.  Quantum Meruit and Unjust Enrichment

Counts Seventeen and Eighteen assert claims for quantum meruit and unjust enrichment. (SAC ¶¶ 228-40.) Plaintiff alleges that Defendants benefitted from services that GEMA provided and seeks "the fair market value of its services, in an amount to be determined at trial." (*Id.* ¶¶ 233, 240.)

Defendant IFN moves to dismiss the quantum meruit and unjust enrichment claims, arguing that because Plaintiff only alleges oral agreements that bind IFN, the claims fail to satisfy the statute of frauds. (IFN Feb. 26, 2007 Mem. 9-10.) The Court has already determined, however, that Plaintiff may be able to hold IFN to Sidenor's contract by piercing Sidenor's corporate veil. These writings can satisfy the statute of frauds for purposes of establishing a claim of quantum meruit.

Sidenor also moves to dismiss the quantum meruit and unjust enrichment claims, arguing that Plaintiff has renounced its claim that Sidenor had an interest in the steel mills when they were sold. (*See* Sidenor's Aug. 11, 2008 Mem. 10-11.) Contrary to these arguments, the SAC does adequately allege that Sidenor had an ownership interest in the steel mills when they were sold in 2004. (*See, e.g.,* SAC ¶¶ 7, 89.)

Because Plaintiff has adequately alleged the basis for the quantum meruit and unjust enrichment claims, the Court denies Defendants' motions to dismiss with respect to these claims.

### e.  Fraud Claims

As an alternative to its claims for breach of contract, Plaintiff asserts that Defendants made fraudulent misrepresentations and omissions with respect to the letter agreements. (SAC ¶¶ 242, 256.) Defendants argue that Plaintiff has failed to plead *any* of the required elements of a fraud claim with particularity as required by Rule 9(b) and therefore those claims should be dismissed. (Def. IFN's Supp. Mem. in Support of its Motion to Dismiss 11-18, Aug. 11, 2008 (IFN's Aug. 11, 2008 Mem.).) Sidenor further argues that the fraud claims are barred because they are simply recast breach of contract claims. (Sidenor's Aug. 11, 2008 Mem. 12-15.) The Court addresses each of these arguments in turn.

#### i.  Separateness of Claims

Under New York law, a plaintiff cannot transform a contract claim into a fraud claim simply by alleging that the defendant "'entered the . . . agreement while intending not to perform it.'" *Nash v. The New Sch.*, No. 05 Civ. 7174 (KMW), 2009 WL 1159166, at *3 (S.D.N.Y. Apr. 29, 2009) (citing *Angel v. Bank of Tokyo-Mitsubishi, Ltd.*, 835 N.Y.S.2d 57, 59 (App. Div. 2007)); *see also Bridgestone/Firestone,* 98 F.3d at 19-20 (holding that under New York law, even intentionally false statements of intent to perform a contract do not rise to fraud).

Where the claim for the fraud is sufficiently separate from the claim for breach

19

of contract, however, the fraud claim can stand. *See Bridgetsone/Firestone*, 98 F.3d at 20-21.  A fraud claim is sufficiently separate if a plaintiff is able to demonstrate either (a) a legal duty separate and apart from the contractual obligation, *see id.* at 20 (citing *Van Neil v. Berger*, 632 N.Y.S.2d 48, 48 (App. Div. 1995)), (b) a "fraudulent misrepresentation collateral or extraneous to the contract," *id.* (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)), or (c) special damages that are caused by the fraud that are not recoverable under the contract claim, *id.* (citing *Deerfield*, 68 N.Y.2d at 956 ).  In this case, Plaintiff adequately alleges a fraudulent misrepresentation that is separate and apart from the promise to perform under the contract.

In the SAC, Plaintiff alleges two classes of misrepresentations, one of which is separate from promises of either Defendant to perform under the various letter agreements. First, Plaintiff alleges Arrieta and Teruel represented to GEMA, in November 2001, September through October 2002, and January through February 2003, that the Mexican steel mills were not directly owned by IFN. (SAC ¶ 242.) These statements are collateral to whether or not Sidenor would comply with the obligations of any of applicable letter agreements, and therefore can serve as the basis for a fraud claim.

Second, Plaintiff alleges that in or about March through April of 2003, after GEMA confronted the Defendants with evidence of direct ownership of the Mexican steel mills by IFN, Arrieta and Teruel made a series of representations intended to induce GEMA to refrain from terminating the applicable letter agreement. (*Id.* ¶¶ 243, 245.)  As set forth in the SAC, these representations included the following:

> (a) inasmuch as IFN had a direct ownership interest in the Mexican steel mills, IFN intended to be bound by the applicable engagement letter with regard to the Transaction with Target ICH even though it was not a signatory thereto, (b) it was impractical and unnecessary for IFN to sign the applicable engagement letter as Defendants understood that IFN was bound by it, and (c) both Sidenor and IFN are owned and controlled by Sabino Arrieta, (d) there was no separate decision-making between the two entities, (e) the same officers exercised control over both entities, and (f) GEM should treat Sidenor and IFN as the same entity for purposes of the Transaction with Target ICH.

(*Id.* ¶ 243.) However, these "Post Agreement Representations," unlike the earlier representations, were promises that IFN would perform and therefore are insufficient to support a fraud claim.

In sum, the fraudulent misrepresentation claim, to the extent that it is based on statements ensuring IFN's obligations under the letter agreement and promise to perform under those agreements, is dismissed.  To the extent that the claim is premised on Defendants' assurance that IFN was not a direct owner of the Mexican steel mills, it is not dismissed.  Therefore, the remainder of the analysis need only address the

misrepresentations of IFN's ownership interest in the Mexican steel mills.

### ii. Legal Standard

"While the rules of pleading in federal court usually require only 'a short and plain statement' of the plaintiff's claim for relief, averments of fraud must be 'state[d] with particularity.'" *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009) (quoting Fed. R. Civ. P. 8, 9(b)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98-99 (2d Cir. 2007). The language of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns*, 493 F.3d at 99 (citing *Rombach*, 355 F.3d at 171).

In order to satisfy Rule 9(b), the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also ATSI Commc'ns*, 493 F.3d at 99. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99. Moreover, "[w]here multiple defendants are asked to respond to allegations of fraud,

the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *see also Mills*, 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").[9]

### iii. Analysis

To state a common law fraud claim in New York, a plaintiff must allege that (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995). "Alternatively, instead of an affirmative misrepresentation, a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (App. Div. 2003); *see also Banque Arabe*, 57 F.3d at 153; *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984). Having carefully reviewed the SAC, the Court

---

[9] Although the SAC repeatedly charges the statements to "Defendants," and does not charge the statements to one in particular, this was simply due to Plaintiff's understanding that Sidenor and IFN should be "treated as the same entity." (*Id.* ¶¶ 102-103.) At this stage of the proceedings, then, Plaintiff fairly charges both Defendants with the statements. Accordingly, "[t]here can be no doubt that the Complaint gives each defendant notice of precisely what he is charged with. No more is required by Rule 9(b)." *Goldman v. Belden*, 54 F.2d 1059, 1070 (2d Cir. 1985).

concludes that Plaintiff has adequately pled claims for fraud with particularity.

The SAC adequately alleges a material misrepresentation. The SAC alleges that in November 2001, September through October 2002, and January through February 2003, Arrieta and Teruel represented that the Mexican steel mills were not directly owned by IFN. (SAC ¶ 242.) In addition to the affirmative misrepresentations, plaintiff also alleges that "Defendants intentionally concealed from GEM that IFN had a direct and/or indirect ownership interest in the Mexican steel mills, other than through Sidenor." (SAC ¶ 256.) The Court will not say that such misrepresentations are "so obviously unimportant to a reasonable [party] that reasonable minds could not differ on the question of their importance." *Goldman* 754 F.2d at 1067. In addition, the alleged statements by Arietta and Teruel are sufficient to allege a duty to disclose by making a "partial or ambiguous statement." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Junius Constr. Corp. v. Cohen*, 257 N.Y. 393, 400 (1931) (Cardozo, J.)).

The second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation. *Banque Arabe*, 57 F.3d at 153. Common sense dictates that if Defendants made the statements alleged in the complaint, the Defendants did so knowing their falsehood. In addition, the circumstances surrounding the letter agreements provide "strong circumstantial evidence of conscious misbehavior." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

The third element of a fraud claim is reasonable reliance. *Banque Arabe*, 57 F.3d at 153. With regard to actual reliance, the allegations support the inference that, but for the Defendants' fraudulent misrepresentations, Plaintiff would have required new letter agreements, or at least abandoned the old ones and ceased performance. In addition, the Court cannot say that Plaintiff's reliance was unreasonable as a matter of law. GEMA allegedly relied on reasonable statements made by individuals holding themselves out to be in positions of knowledge and power in Defendants' companies.

Finally, New York law requires that a plaintiff show that it was damaged as a result of the defendant's misrepresentation or omission. *Banque Arabe*, 57 F.3d at 153. Plaintiff has adequately alleged that it was damaged by the Defendants' misrepresentations or omissions. By "continuing to work under the applicable engagement letter without requiring IFN to sign [the] engagement letter and without requiring Sidenor and IFN to enter a new engagement letter" (SAC ¶ 245), Plaintiff lost out on whatever incremental Success Fee it would have been entitled to with IFN as a party to the contract.[10] Because the terms and structure of the transaction, as well as the ownership structure of the steel mills are still unknown to Plaintiff, the Court will not require GEMA to plead the actual dollar amount to which they were damaged.

---

[10] Without submissions from the parties, the Court is disinclined to decide whether Plaintiff would, in fact, be entitled to more money if IFN was a signatory to the contract.

* * *

In sum, Plaintiff has adequately pled the requisite elements of fraud with particularity. Accordingly, Defendants' motions to dismiss the fraudulent misrepresentation and fraudulent concealment claims are denied.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss Counts Two through Six, Eight, Twelve, and Fifteen. Defendants' motions to dismiss the remainder of the counts are denied. The Clerk of the Court is respectfully directed to terminate the motions docketed as Doc. Nos. 13 and 17. The parties are directed to jointly submit a proposed case management plan by November 6, 2009. A form case management plan can be found on the Court's website at http://www1.nysd.uscourts.gov/jud ge_info?id=99.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: October 27, 2009
New York, New York

* * *

Plaintiff Gem Advisors, Inc. is represented by August C. Venturini and Sean W. Higgins, 230 Park Avenue, Suite 545, New York, NY 10169. Defendant Sidenor is represented by Stephen M. Harnik, Harnik

Wilker & Finkelstein LLP, 645 Fifth Avenue, 7th Floor, New York, NY 10022-5397. Defendant IFN is represented by Charles L. Rosenzweig, Rand Rosenzweig Radley & Gordon, LLP, 50 Main Street, 12th Floor, White Plains, NY 10606.